UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS SMITH,

       Plaintiff,

                                   Case No. 1:15-cv-131

v.

                                   HON. ROBERT HOLMES BELL

TOWNSHIP OF PRAIRIEVILLE et al.,

       Defendants.

_____/

## O P I N I O N

This is a civil rights case brought pursuant to 42 U.S.C. § 1983. Plaintiff Douglas Smith, a resident of Cloverdale, Michigan, brings this action against Defendants Township of Prairieville, Michigan, Township of Barry, Michigan, William Thompson, Eric Gustafson, and Carlos Fossati. On April 12, 2016, Defendants filed three motions for summary judgment. (ECF Nos. 48, 49, 51.) Plaintiff has filed responses, to which Defendants have filed replies. For the reasons that follow, Defendants' motions for summary judgment will be granted in part.

### I.

On February 18, 2013, Detective Eric Gustafson of the Barry Township Police Department spotted a vehicle that matched the description given by a caller who reported that she suspected an individual was driving while intoxicated. Gustafson followed the vehicle as it pulled into Plaintiff's driveway at 4710 Cloverdale Road. Gustafson observed that the

driver's behavior was "a little erratic," and called for backup. (Gustafson Dep. 20, ECF No. 56-5.) William Thompson, the Prairieville Township Chief of Police, arrived first, followed by Michigan State Police Trooper Carlos Fossati. The driver told the officers that he was delivering marijuana to an individual at Plaintiff's residence. (Thompson Dep. 22, ECF No. 57-3.)

Detective Gustafson and Chief Thompson approached Plaintiff's front door to speak with him. While speaking with Plaintiff, Gustafson observed "an odor that was evident of burnt marijuana emanating from the home," and noticed a child who appeared to be four or five years old inside. (Gustafson Dep. 22.) The child was Plaintiff's nephew Tyler. At that time, Plaintiff told Thompson that others had recently smoked marijuana inside, but that he was in a different room with Tyler while they were doing so. (Smith Dep. 53, ECF No. 56-2.)

The officers asked Plaintiff if they could search the home. Plaintiff stated that they asked "if it would be alright if they just do a walk-through." (*Id.* at 54.) When he asked what a "walk-through" was, both officers told him that "[w]e just walk through and look and make sure there's not a bunch of [marijuana] plants in there and that's it." (*Id.*) Chief Thompson stated that he asked whether the officers could conduct a "cursory search." (Thompson Dep. 22.) He stated that a cursory search "doesn't necessarily provocate a brief search or a thorough search. With all the furtive movements of people outside and the belief that there could be contraband within the residence, we were looking for people, drugs, or a combination [of] both." (*Id.* at 23.) Plaintiff consented to what he contends was a walkthrough.

2

After receiving consent, Chief Thompson stood in the kitchen with Plaintiff while Detective Gustafson first searched the bathroom. (Smith Dep. 55.) Plaintiff could hear cupboards opening and closing. Gustafson then came into the kitchen and opened one or two utensil drawers. At that point, Plaintiff told the officers "The search is over. Get out." (*Id.* at 56.) Plaintiff states that Gustafson told him, "You gave us permission to search and that's what I'm going to do." (*Id.* at 58.) Plaintiff responded, "No, I gave you permission to walk through. Now get out." (*Id.*) Gustafson left the house, but Plaintiff allowed Thompson to remain and walk through the other rooms. Plaintiff followed Thompson while he continued the search of the home. Thompson did not open any drawers. (*Id.* at 61.) Plaintiff also allowed Thompson to search the pole barn outside of the house. Thompson observed Plaintiff's other nephew's girlfriend, who was 15 or 16 years old, inside the pole barn sleeping, and checked with her parents to make sure she was allowed to be there. (*Id.* at 63.) After searching the pole barn, Plaintiff returned to his house and went inside. Officers were talking with "the other young people" that were on the property and investigating any potential criminal wrongdoing. (*Id.* at 64.)

Later, Plaintiff walked outside to put wood in his wood stove. Plaintiff was wearing a sweatshirt, sweatpants, and tennis shoes, and it was "[a]bout 20 degrees." (*Id.* at 66.) Detective Gustafson told Plaintiff that he could not walk to the pole barn to put the wood in the stove. (*Id.* at 65.) Plaintiff states that he told the officers several times that he had Raynaud's syndrome and that he could not be outside in the cold, but the officers did not care. (*Id.*) He told them that Raynaud's "was a form of frostbite that never gets better that

3

only gets worse." (*Id.* at 87.) After about 20 minutes, Plaintiff said "I'm going to fill my wood stove whether you like it or not." (*Id.* at 70.) No one responded to that statement, but Plaintiff states that the Michigan State Police Trooper (presumably Fossati) walked with him to the wood stove. (*Id.* at 72.) Neither Thompson nor Gustafson stopped him. Plaintiff put wood in the stove and walked back to the house. On his walk back to the house, Gustafson told Plaintiff to stay on the porch. Thompson did not say anything, but was with Gustafson when he said that. (*Id.* at 77.) Plaintiff stood on the porch "for probably 20 minutes, another half hour. I turned around and told him to go to hell, that I'm going in the house to be with my kid and I'm freezing to death. If you don't like it, shoot me in the back." (*Id.* at 77-78.) Nobody stopped him.

In the meantime, officers had called Child Protective Services (CPS) because Plaintiff's nephew Tyler was in the house while marijuana was being smoked. Detective Gustafson stated that, "for safety reasons, it was pretty standard to contact CPS to let them know what was going on so they could investigate to see if there was any abuse or neglect or anything like that." (Gustafson Dep. 24; *see also* Gustafson Report, ECF No. 51-2, PageID.526 ("Due to the circumstances, Chief Thompson requested that CPS be notified. It was clear that people had been smoking marijuana in the house with a five year old present. There were numerous minors in the house that had also smoked marijuana. CPS worker Kelly Root arrived at the scene to conduct an evaluation.").) Chief Thompson stated that it took CPS about "45 minutes to an hour" to arrive after the search had been completed, and

that Plaintiff was inside with his nephew when CPS arrived. (Thompson Dep. 36.) Tyler was allowed to remain at the home.

Plaintiff states that days after he was forced to stand outside in the cold, his "whole body went numb" and he was taken to the hospital. (*Id.* at 13-14.) Plaintiff's medical records indicate that he went to the Delton Medical Center for treatment of frostbite on March 6, 2013. (ECF No. 56-9, PageID.795.) Plaintiff states that he is now disabled as a result of his Raynaud's syndrome and acid reflux disease, and that he receives social security benefits as a result. (Smith Dep. 10.) He was first diagnosed with Raynaud's at 28 years old, but it was manageable for 12 or 14 years as long as he dressed properly and took care of himself. Plaintiff states that his Raynaud's syndrome started to get worse after the officers made him stand outside in the cold for an hour. (*Id.* at 11-12.)

As a result of the officers' actions on February 18, 2013, Plaintiff filed a complaint in this Court under 42 U.S.C. § 1983.

## II.

Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v.*

*Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). When such a motion is filed by the defendant, as in this case, the "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits [.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

Plaintiff's complaint alleges that Defendants: (1) violated his Fourth Amendment right to be free from unlawful arrest; (2) violated his Fourth Amendment right to be free from illegal searches; (3) violated his rights to be free from false arrest/false imprisonment under state law; (4) were deliberately indifferent to his serious medical needs; (5)  were grossly negligent in violation of Mich. Comp. Laws § 691.1407(2); and (6) implemented and executed customs or policies that resulted in the constitutional violations.

Defendants have raised the defense of qualified immunity to several of Plaintiff's claims. Qualified immunity protects officials from civil liability unless they are "plainly incompetent" or "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Sixth Circuit applies a two-pronged test to determine whether an officer is entitled to

qualified immunity, examining: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 553 U.S. 194, 201-02 (2001)).

A right is "clearly established" for purposes of this analysis when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citations omitted). The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has "repeatedly" cautioned the lower courts "not to define clearly established law at a high level of generality," as the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742) (alteration in original). It is "especially important" to examine the specific nature of the case in determining whether a right is clearly established "in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

## A. Unlawful Arrest

Plaintiff first alleges that Defendants violated his Fourth Amendment rights when they "falsely arrested and/or falsely detained" him "without any probable cause, exigent circumstances, or other unlawful purpose." (Compl. ¶ 28, ECF No. 1.) Plaintiff states that Defendants restricted his freedom of movement "for no justifiable reason whatsoever," and "refused to let him enter his own home." (*Id.* ¶ 29.) Plaintiff does not identify the actions taken by each individual Defendant that violated his rights.

### 1. Constitutional Violation

#### a. Plaintiff was seized.

The Fourth Amendment provides, in part, that: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As the foregoing language indicates, Fourth Amendment rights attach only when a "seizure" has occurred. *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988). Defendants argue that "it is questionable whether Plaintiff was actually 'seized.'" (Gustafson Mot. Summ. J. 9 n.5, ECF No. 48.)

At the summary judgment stage, at least, the Court disagrees. "The Supreme Court has identified a 'seizure' as occurring at that point in time when, 'in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Knox*, 839 F.2d at 289 (quoting *United States v. Mendenhall*, 446 U.S.

544, 553 (1980)). Plaintiff stated that after leaving his home to put wood in the wood stove, Detective Gustafson stopped him on the front porch and said, "You're not going anywhere. You stand right there." (Smith Dep. 65.) A reasonable person would not feel free to leave upon hearing such a statement. *United States v. Bohannon*, 225 F.3d 615, 619 (6th Cir. 2000) (Batchelder, J., dissenting) (citation and quotation marks omitted) ("A police officer's verbal command—if heeded—is often sufficient to seize a person."). Thus, looking at the facts in the light most favorable to Plaintiff, a seizure occurred.

### b. Plaintiff was not arrested.

The next question, then, is whether the seizure violated Plaintiff's Fourth Amendment rights. This determination hinges on the degree of restraint (whether it was an investigatory detention or an arrest)[1] and the degree of the officers' justification for using that restraint (reasonable suspicion or probable cause).

When a detention "rises to the level of a full-fledged arrest," or even a *de facto* arrest, it must be supported by probable cause. *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (citing *Dunaway v. New York*, 442 U.S. 200, 212-14 (1979)). When officers are conducting a "brief investigatory detention," known as a *Terry* stop,[2] however, that detention must be supported only by reasonable suspicion of criminal activity. *Id.*; *see also Michigan v. Summers*, 452 U.S. 692, 697-98 (1981) (quoting *Dunaway*, 442 U.S. at 209) (noting that "there is some latitude" for officers to detain an individual absent probable cause when "the

---

[1]  The fact that Plaintiff was "seized" does not mean that he was "arrested." *See United States v. Montgomery*, 377 F.3d 582, 587 (6th Cir. 2004) (finding it "unclear" whether a seizure of the defendant "was a full custodial arrest, rather than a mere investigative detention under the progeny of *Terry*").
[2]  *Terry v. Ohio*, 392 U.S. 1 (1968).

intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable").

There is no bright-line test for determining whether a suspect is under arrest for purposes of the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 506 (1983). Factors to consider in determining whether a *Terry* stop has evolved into an arrest include the length of detention, whether *Miranda* warnings are given, whether the defendant is transported from a public place to the police station, and whether the officers use force on the defendant or place the defendant in handcuffs. *United States v. Lartigue*, Nos. 93-5356, 93-5369, 1994 WL 151337, at *6 (6th Cir. Apr. 26, 1994). Here, the stop occurred outside of Plaintiff's home. He was not transferred to the police station or placed inside a police car. He was never given a *Miranda* warning. Moreover, no officer ever placed a hand on Plaintiff, or suggested to Plaintiff that they would do so. These facts all support a finding that an arrest was not made. Instead, the seizure of Plaintiff outside of his home was more analogous to a *Terry* stop.

### c. The stops were constitutional.

The Sixth Circuit engages in a two-part analysis when evaluating the constitutionality of a *Terry* stop. First, looking to the totality of the circumstances, the court asks whether the initial stop was based on "'specific and articulable facts which gave rise to reasonable suspicion.'" *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the court finds that the initial stop was

based on reasonable suspicion, the court then asks whether the degree of the intrusion was reasonable in relation to the officers' suspicions and the surrounding circumstances. *Id.* A determination of reasonableness "depends on a balance between 'the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994) (quoting *Terry*, 392 U.S. at 21). The intrusion is more likely to be found reasonable if it is sufficiently limited in time and if the officers used the least intrusive means reasonably available. *Davis*, 430 F.3d at 354 (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 825-26 (6th Cir. 2005)).

Here, the officers had "specific and articulable facts which gave rise to reasonable suspicion" before detaining Plaintiff outside of his home. Upon opening Plaintiff's front door, the officers smelled burnt marijuana. Plaintiff was inside the home with a young child, and "seemed very unconcerned that the marijuana smoke was throughout the house, being inhaled by his five year old nephew." (Gustafson Report 4.) There were "numerous minors in the house that had also smoked marijuana." (*Id.* at 5.) Officers were concerned about the marijuana smoke and the possibility of child neglect. As Detective Gustafson noted, at the time of Plaintiff's detention, CPS had been contacted "so they could investigate to see if there was any abuse or neglect or anything like that going on," in light of the clear smell of marijuana inside the home. (Gustafson Dep. 24.) Similarly, Fossati stated that he was asked to stand outside with Plaintiff "because of an ongoing investigation whether he was a suspect or just a subject or somebody they want to talk to." (Fossati Dep. 19.)

11

Further, the intrusion was reasonable in relation to the officers' suspicion and the surrounding circumstances. According to Plaintiff, he was required to wait outside for approximately twenty minutes on two separate occasions. Although there is "no rigid time limitation" for determining the lawfulness of a *Terry* stop, the Supreme Court has upheld a twenty-minute detention when the police officers acted diligently and did not unnecessarily delay the investigation. *See United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). The Sixth Circuit has also found that a ten-to-fifteen minute delay did not elevate a *Terry* stop into an arrest, when the officers were waiting for DEA agents to arrive at the scene, as the "sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions." *United States v. Winfrey*, 915 F.2d 212, 217 (6th Cir. 1990); *see also Davis*, 430 F.3d at 355 (thirty minute delay while waiting for drug-sniffing dog to arrive found reasonable). The amount of time that Plaintiff was detained for, while the officers spoke with minors on the property who had smoked marijuana, and waited for CPS to arrive and determine whether child abuse or neglect had occurred, was reasonable. The minimal degree of intrusion—outside of Plaintiff's home, and using no force or handcuffs—was also reasonably related to the officers' concerns regarding child abuse or neglect and the fact that other minors were smoking marijuana in Plaintiff's presence. Accordingly, no constitutional violation occurred, and the officers are entitled to qualified immunity for this claim.

### 2. The right was not clearly established.

Plaintiff argues that the right to be free from unlawful arrests was clearly established in February 2013, stating: "A reasonable officer has to conclude that he had probable cause

12

to arrest or detain the individual. In a case like this, where probable cause was missing, it would have been clear to a reasonable officer that his conduct was unlawful." (Resp. to Mot. Summ. J. 23, ECF No. 57.) But Plaintiff defines this right too broadly. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Mullenix*, 136 S. Ct. at 308 (noting the importance of examining the "specific nature of the case," particularly when the plaintiff alleges Fourth Amendment violations).

A clearly established right is a right that is "sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093 (internal quotation marks and alteration omitted). As the Sixth Circuit has noted, "[t]here is no litmus test" for determining when the line between a permissible investigative stop and an unlawful arrest "is crossed." *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008). Given the close calls implicated in Fourth Amendment claims, *Mullenix*, 136 S. Ct. at 308, and the lack of existing precedent pointed out by Plaintiff or discovered by this Court that "place[s] the statutory or constitutional question beyond debate," *al-Kidd*, 563 U.S. at 741, the Court cannot say that every reasonable officer would understand that he was violating the Fourth Amendment by requiring a person, suspected of possible child abuse or neglect and of allowing minors to smoke marijuana in his presence, to stand outside while CPS arrives and while the investigation can be completed. Accordingly, Defendants entitled to qualified immunity for this additional reason.

13

**B. Illegal Search**

Plaintiff next argues that "Defendants" violated his Fourth Amendment rights when they exceeded the scope of the search that he consented to by opening and rummaging through drawers, when he only agreed to a walkthrough. (Compl. ¶¶ 36, 37.) Defendants again raise the defense of qualified immunity. Although Plaintiff does not identify which Defendants he is raising this claim against, he has not alleged, and there is no evidence in the record to suggest, that Defendants Thompson or Fossati improperly opened or rummaged through any drawers. Indeed, Fossati was outside of the home when the search occurred. (Fossati Dep. 22; Smith Dep. 91.) Thompson was inside Plaintiff's home, but was not in the same room when Gustafson allegedly opened the bathroom cupboard. After Plaintiff objected to Gustafson's search, he allowed Thompson to continue searching. (Thompson Dep. 26.) Because Plaintiff has not demonstrated that these Defendants have violated his constitutional right to be free from illegal searches, they are entitled to qualified immunity on this claim. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (noting that "[e]ach defendant's liability must be assessed individually based on his own actions" and that generally, "mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability").

Accordingly, the Court will examine whether Detective Gustafson's act of opening drawers violated Plaintiff's Fourth Amendment rights.

### 1. Constitutional Violation

Generally, a search conducted without a warrant issued upon probable cause violates the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). But it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* When searching upon receiving consent, officers are required to comply with any limitations imposed by the consenting party. *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *Walter v. United States*, 447 U.S. 649, 656 (1980) ("[T]he scope of the search is limited by the terms of its authorization.").

The scope of a search "is generally defined by its expressed object." *Id.* According to Plaintiff, Gustafson and Thompson "wanted to look for [marijuana] plants . . . and they asked if it would be all right if they [could] just do a walk-through." (Smith Dep. 54.) Plaintiff asked what a "walk-through" entailed, and the officers said, "[w]e just walk through and look and make sure there's not a bunch of plants in there and that's it." (*Id.*)

Detective Gustafson's motion for summary judgment contends that he was "only told that Plaintiff had consented to the search of his home," and that he was not informed of any limitations on the search. (Gustafson Mot. Summ. J. 11, ECF No. 48.) The motion states that he "did not violate Plaintiff's Fourth Amendment rights in this particular context when he went through a single drawer because he was entitled to rely on Chief Thompson's statements regarding Plaintiff's consent and because it was objectively reasonable for him

15

to believe that the scope of Plaintiff's consent included the drawers, as he reasonably understood that the scope of Plaintiff's consent was the home." (*Id.* at 11-12.) The Court has been unable to locate any testimony in the record to suggest that Chief Thompson informed Gustafson of the permissible scope of the search. Both Smith's and Gustafson's deposition testimony indicate that Gustafson was with Thompson when Smith consented to the search. (Gustafson Dep. 22-23; Smith Dep. 54.)

Regardless, on Defendants' motions for summary judgment, the facts are taken in the light most favorable to Plaintiff. Plaintiff stated that the search he consented to, in front of Gustafson, was a "walkthrough," and that he clarified that this meant the officers would "just walk through and look and make sure there's not a bunch of plants in there and that's it." While Gustafson notes that a search is valid "[a]s long as an officer has an objectively reasonable belief that the search was within the course of consent," *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003), an officer would not reasonably believe that consent to walkthrough a home for the express purpose of making sure there are not "a bunch of plants" also provides consent to open drawers (where marijuana plants would not fit) in the bathroom and kitchen. *See Walter*, 447 U.S. at 657 ("[A] warrant to search for a stolen refrigerator would not authorize the opening of desk drawers."). Because, looking at the facts in the light most favorable to Plaintiff, the search exceeded the scope of consent, it was unconstitutional.

Lastly, Gustafson argues that even if he did exceed the scope of the search by opening one or two drawers, "such a minor expansion" of the otherwise lawful search had only a *de*

16

*minimis* impact on any protected property interest and, therefore, he is not subject to liability. The Sixth Circuit has held, however, that "with regard to the home, there is no *de minimis* exception to the Fourth Amendment." *Smith v. City of Wyoming*, No. 15-3336, 2016 WL 1533998, at *10 (6th Cir. Apr. 15, 2016) (citing *Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door. . . ."); *Silverman v. United States*, 365 U.S. 505, 512 (1961) (holding that an unauthorized intrusion only inches inside a home is "an actual intrusion into a constitutionally protected area")). Accordingly, this argument fails.

### 2. Clearly Established Right

Detective Gustafson also argues that he is entitled to qualified immunity "because it was not clearly established in this particular context that opening a utensil drawer during a consensual search violated Plaintiff's Fourth Amendment rights." The Court disagrees. At the time of the search, it was clearly established that the scope of an official search, "whether by consent or by the issuance of a valid warrant," is "limited by the terms of its authorization." *Walter*, 447 U.S. at 657. It was also clearly established that a search that exceeds the scope of consent is unconstitutional. *See Shamaeizadeh*, 338 F.3d at 547. Accordingly, Detective Gustafson is not entitled to qualified immunity as to this claim.

### C. False Arrest/False Imprisonment

Plaintiff's complaint also raises a claim of "false arrest/false imprisonment." Plaintiff contends that "Defendants caused the arrest and/or imprisonment and/or unlawful detainment of Plaintiff without any legal justification and/or probable cause and otherwise unlawfully

restricted his freedom of movement." (Compl. ¶ 42.) Although Plaintiff's complaint does not distinguish false arrest from false imprisonment, Michigan courts have held that these are separate causes of action. *See Moore v. City of Detroit*, 652 N.W.2d 688, 690 (Mich. Ct. App. 2002). "[T]he general concept of false imprisonment as an 'unlawful restraint of an individual's personal liberty' is broader than, but includes, a false arrest involving law enforcement." *Id.* (quoting *Clarke v. K-Mart Corp.*, 495 N.W.2d 820 (Mich. Ct. App. 1992)). Or, put differently, "false arrest is one type of false imprisonment; when a person is falsely arrested, he or she is always falsely imprisoned." *Romanski v. Detroit Entm't*, 265 F. Supp. 2d 835, 846 (E.D. Mich. 2003).

To prove false arrest, a plaintiff must show: "1) an arrest; 2) of a person; 3) who is innocent of the charge on which he is arrested; 4) by the defendant or at his instigation; 5) without legal justification." *Id.* (citing *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 901 (Mich. 1982) (Williams, J., dissenting)). As discussed in relation to Plaintiff's unlawful arrest claim, the Court finds that an arrest was not made, and that the seizure that did occur was legally justified. Accordingly, Plaintiff's claim of false arrest is meritless.

The elements of false imprisonment are "'[1] an act committed with the intention of confining another, [2] the act directly or indirectly results in such confinement, and [3] the person confined is conscious of his confinement.'" *Moore*, 652 N.W.2d at 691 (quoting *Adams v. Nat'l Bank of Detroit*, 504 N.W.2d 464, 468 (Mich. 1993)) (alterations in original). The confinement, however, "must be 'false,' i.e., without right or authority to do so." *Tumbarella v. Kroger Co.*, 271 N.W.2d 284, 287 (Mich. Ct. App. 1978). Here, although

18

Plaintiff may have been confined, the confinement was not false. The officers had the authority to temporarily detain Plaintiff while the investigation was being completed and while waiting for CPS to arrive. Accordingly, Plaintiff's false imprisonment claim will also be dismissed.

## D. Deliberate Indifference

Plaintiff next contends that his constitutional rights were violated because Defendants were deliberately indifferent to his serious medical needs when they forced him to stand outside in the cold, after he told them that he had Raynaud's disease.[3]

### 1. Constitutional Violation

The Fourteenth Amendment's Due Process Clause provides pretrial detainees with a right to "adequate medical treatment that is analogous to the Eight Amendment rights of prisoners." *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003); *see also Smith v. Erie Cnty. Sheriff's Dep't*, 603 F. App'x 414, 419 (6th Cir. 2015) (noting that the Due Process Clause of the Fourteenth Amendment provides rights that are "tantamount to the Eighth Amendment guarantee for convicted prisoners"). Plaintiffs raising a claim of deliberate indifference to a serious medical need must meet an objective prong and a subjective prong. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

### a. Objective Component

---

[3]   Raynaud's disease is a "rare disorder of the blood vessels, usually in the fingers and toes. It causes the blood vessels to narrow when you are cold or feeling stressed. When this happens, blood can't get to the surface of the skin and the affected areas turn white and blue. When the blood flow returns, the skin turns red and throbs or tingles. In severe cases, loss of blood flow can cause sores or tissue death." U.S. NAT'L LIBRARY OF MEDICINE, *Raynaud's Disease, available at* https://www.nlm.nih.gov/medlineplus/raynaudsdisease.html (last visited June 29, 2016).

The objective component "requires the existence of a 'sufficiently serious' medical need." *Turner v. City of Taylor*, 412 F.3d 629, 646 (6th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This is a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). When the medical need is not "so obvious" that a layperson would recognize the necessity for a doctor's attention, or, when the case "involv[es] only 'minor maladies or non-obvious complaints of a serious need for medical care,'" then the plaintiff is "required to provide verifying medical evidence" showing the effects of a delay in treatment. *Estate of Carter*, 408 F.3d at 312.

Plaintiff has presented evidence demonstrating that he was diagnosed with Raynaud's disease as early as August 24, 1998. (Hastings Orthopedic Clinic Notes, ECF No. 58-7, PageID.1188.) At that time, he was prescribed Darcovet, Ambien, and Silvadene cream. (*Id.*) On subsequent trips to the doctor, he was advised to avoid tight shoes, keep his feet protected, and engage in preventative daily hygienic foot practices to avoid problems with his Raynaud's. (3/9/2016 Mansky Notes, ECF No. 58-8, PageID.1192.) On March 6, 2013, Plaintiff visited the Delton Medical Center. His medical records note: "The patient is a 53 year old male who presents with frostbite. Note for 'Frostbite': PT is here to be seen for bilateral hands and feet that have frostbite that occurred 2/18/13. PT states he can never get warm and goes to the bathroom several times in a day." (3/6/2013 Medical Record, ECF No. 58-9, PageID.1204.) Accordingly, even if Plaintiff's Raynaud's disease was not so obvious

20

that a layperson would recognize the need for medical attention, Plaintiff has provided "verifying medical evidence" showing the effect of the officers' alleged deliberate indifference to his medical needs and, thus, he has satisfied the objective prong.

### b. Subjective Component

The subjective component of a deliberate indifference claim requires that the officer "subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCreary*, 273 F.3d 693, 703 (6th Cir. 2001). An officer may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8 (1994).

The Sixth Circuit has found that an issue of fact exists as to whether the subjective component was satisfied when presented with circumstances similar to this case. In *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005), the plaintiff "was not exhibiting physical symptoms of distress," *id.* at 794, but informed two officers "that she required insulin for her condition and that she was past due for her current dose. [The plaintiff] contends that she informed the unnamed officer of her condition in detail when he escorted her to her holding cell." *Id.* at 798. Because the plaintiff explicitly informed the officers of her medical condition, the officers were "allegedly aware of facts from which the inference of substantial risk of harm could be drawn." *Id.* Accordingly, the court found that a genuine issue of material fact exists as to whether the officers acted with deliberate

21

indifference. In *Cain v. Irvin*, 286 F. App'x 920 (6th Cir. 2008), the plaintiff had allegedly been struck in the face with a "fist pack." *Id.* at 922. She told officers that "she was in great pain and that she wished to go to the hospital." *Id.* at 926. The officer "not only refused the request but mocked and insulted her." *Id.* The Sixth Circuit found that, assuming these facts to be true, the subjective prong had been satisfied, as the plaintiff had informed the officers of the pain she was in. And in *Estate of Carter*, the Sixth Circuit found that the subjective prong was satisfied after an officer "was both directly informed by [the plaintiff] that she was in distress and was informed by [another officer] that she was experiencing chest pains, had not taken her 'heart' medication, and needed to go to the hospital," yet disregarded these statements and took no action. 408 F.3d at 313.

The facts here, construed in the light most favorable to Plaintiff, are similar to the above cases. The first time Plaintiff went outside to put wood in the stove, he told the officers[4] that he had Raynaud's "a minimum of three to four" times. (Smith Dep. 103.) When he returned from putting the wood in the stove and was again stopped on the porch, he mentioned his Raynaud's "[a]nother two or three times." (*Id.* at 104.) Plaintiff told the officers "I have Raynaud's. I cannot be out in the cold." (*Id.* at 66.) Plaintiff also explained what Raynaud's was. (*Id.*) He said that Raynaud's "was a form of frostbite that never gets better that only gets worse." (*Id.* at 87.) The officers "didn't care." (*Id.* at 66.) Like *Garretson*, *Cain*, and *Estate of Carter*, the officers were made aware of a medical condition

---

[4]   According to Plaintiff's testimony, Thompson, Gustafson, and Fossati were all outside on the porch when Plaintiff informed the officers of his Raynaud's disease. (Smith Dep. 66, 73-74.) Although Chief Thompson stated that he remained inside, the facts are taken in the light most favorable to Plaintiff for this motion. Because, according to Plaintiff, all three officers were made aware of his medical condition, and all three failed to take action, the officers' conduct will be analyzed together.

that could get worse if no action was taken, and the officers chose to disregard that risk. Accordingly, a reasonable jury could find that the officers subjectively perceived facts from which to infer substantial risk to Plaintiff, that they drew the inference, and that they still disregarded that risk.

### 2. Clearly Established Right

Because a question of fact exists as to whether a constitutional violation occurred, the Court must then determine whether, at the time of that violation, the right was clearly established. The Sixth Circuit has "explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Estate of Carter*, 408 F.3d at 313 (citing *Heflin v. Stewart Cnty.*, 958 F.2d 709, 717 (6th Cir. 1992)). Still, Plaintiff "must assert a 'particularized' right to medical care." *Garretson*, 407 F.3d at 798; *see also Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992).

In *Garretson*, the particular right asserted was "the right to obtain therapeutic insulin." 407 F.3d at 798. Although the court did not find any binding precedent holding that there is a right to obtain therapeutic insulin, it held that this right was clearly established because case law was clear that "'if a prisoner with a serious medical injury requested help and was ignored, such circumstances could give rise to a deliberate indifference claim.'" *Id.* (citing *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir. 1989)). The officers "knew that [the plaintiff] was an insulin-dependent diabetic who was past due for treatment. And, they arguably denied her insulin by either not seeking medical help for her or failing to transfer

23

her to a location where she could receive treatment after she notified them of her immediate health needs." *Id.* Accordingly, the district court's grant of summary judgment was improper.

Similar to *Garretson*, here, the Court is unable to locate any binding precedent holding that a person with Raynaud's disease has a right to avoid cold temperatures to prevent his condition from worsening. But, especially after *Garretson*, the Court remains cognizant of clearly established law holding that "if a prisoner with a serious medical injury requested help and was ignored, such circumstances could give rise to a deliberate indifference claim." *Garretson*, 407 F.3d at 798. Looking at the facts in the light most favorable to Plaintiff, that is what happened here. Plaintiff informed the officers of his serious medical need (Raynaud's), informed the officers of the consequences (frostbite), and informed the officers that he could not be outside for an extended period of time. The officers "didn't care," and required Plaintiff to remain outside. In other words, Plaintiff requested help and was ignored. The law was clearly established that these facts "could give rise to a deliberate indifference claim." *Id.* Accordingly, the officers are not entitled to qualified immunity as to this claim.

## E. Gross Negligence

*Plaintiff alleges that Defendants were grossly negligent in violation of Mich. Comp.* Laws § 691.1407(2) "because they deliberately ignored the clear medical signs that Plaintiff had a serious medical condition that would have significant and profound effects on him if left out in the cold weather." (Compl. ¶ 57.) Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). It is an "almost . . . willful disregard of precautions or measures to attend

to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004). Whether gross negligence occurred is "generally an issue of fact;" summary judgment should be granted only "where reasonable minds could not differ." *Schack v. City of Taylor*, 177 F. App'x 469, 474 (6th Cir. 2006) (citing *Tarlea*, 687 N.W.2d at 339).

Reasonable minds could differ as to whether Defendants, who, according to Plaintiff, were made aware that Plaintiff had Raynaud's disease, were told what Raynaud's disease was and of the possibility of frostbite, were told that Plaintiff "cannot be out in the cold," and still required Plaintiff to stand outside in 20 degree weather for 20 minutes on two occasions were grossly negligent. *See Garretson*, 407 F.3d at 801. Accordingly, Defendants' motion for summary judgment will be denied as to this claim.

**F. Municipal Liability**

Plaintiff's last claim alleges that Defendants Prairieville Township and Barry Township[5] "practiced and/or permitted customs and/or policies and/or practices that the Defendant officers/employees and other personnel acted in conformity with and which were the moving force behind the violations of Plaintiff's constitutional rights." (Compl. ¶ 63.) Plaintiff states that the "customs and/or policies and/or practices included but were not limited to" failing to train officers how to perform lawful searches and to take appropriate action to ensure the health and safety of those under their care, failing to control or discipline

---

[5]   Plaintiff also included the County of Barry in this claim. The County was previously dismissed as a defendant with prejudice. (ECF No. 47.)

officers, failing to require officers to comply with established policies, and failing to enact medical protocol in dealing with citizens under their control and care." (*Id.* ¶¶ 64-65.)

A plaintiff raising a § 1983 claim on the basis of a municipal policy or custom is required to identify the policy, connect the policy to the municipality, and show that the particular injury resulted from that policy. *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). Plaintiff has provided no evidence identifying a specific custom, policy, or practice that was the "moving force" behind the alleged violations and, accordingly, neither Prairieville Township nor Barry Township may be held liable under this theory.

To prove § 1983 liability on a failure-to-train theory, Plaintiff must prove three elements: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [Township's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (internal quotation marks and citations omitted). Again, Plaintiff provides no evidence showing deficiencies with Barry Township or Prairieville Township's training programs. Chief Thompson stated that he received training on the steps to take when a citizen is requesting medical attention, that he received first aid training, and that he received training regarding when to intervene if a citizen's medical complaints are being ignored. (Thompson Dep. 16.) In response to the only question about the training he had received from Barry Township, Detective Gustafson stated that he received annual use-of-force training. (Gustafson Dep. 12.)

26

Because Plaintiff has done no more than "identify a 'metaphysical doubt' or 'hypothetical plausibility'" that the training programs were inadequate, this claim will be dismissed. *Chappell*, 585 F.3d at 912 (quoting Fed. R. Civ. P. 56(c)).

## IV. Conclusion

For the reasons stated above, Defendants' motions for summary judgment will be granted in part. Defendant Gustafson is not entitled to qualified immunity on the illegal search claim, and Defendants Fossati, Gustafson, and Thompson are not entitled to qualified immunity on the deliberate indifference claim. The gross negligence claim against Defendants Fossati, Gustafson, and Thompson also survives summary judgment. Defendants Barry Township and Prairieville Township will be dismissed from this action with prejudice.

An order will enter consistent with this opinion.


Dated: July 11, 2016                              /s/ Robert Holmes Bell
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE